MEMORANDUM OF DECISION
On February 18, 1999, The Department of Children and Families (DCF) filed a petition to terminate the parental rights of Donald B. Sr. and Deborah B. to their son Donald B. Jr. (D.O.B. 8/23/93). Both parents were personally served with the petition for termination, both appeared and had court appointed attorneys. The court has jurisdiction in this matter and there is no pending action affecting custody of Donald Jr. in any other court. The sole ground alleged for said termination of parental rights is the parents' failure to rehabilitate. Trial commenced on September 21, 1999 and continued over non-consecutive days, September 28, October 14, and October 25. For the reasons set forth below the court now grants the termination petitions.
FACTS
The court, having read the verified petition, the social studies and the various documents entered into evidence, and having heard the testimony of the witnesses, finds the following facts and credits the following evidence.
Donald B. Jr. (also known as D.J.) was first removed from his parents care on September 8, 1995 on a 96 hour hold as a result of a burning incident that did not directly involve D.J. but rather his infant sibling Amber B. (D.O.B. 8/16/95). An order of temporary custody was obtained on September 12, 1995. D.J. spent four months in foster care until the court ordered him returned CT Page 2824 home to his parents on January 10. 1996.
A second order of temporary custody regarding D.J. was granted on October 11, 1996. D.J. was hospitalized with burns of 30% of his body as a result of a pot of boiling water spilling on his upper body while in his parents care. An initial neglect petition was ultimately amended and both parents entered a nolo contendere plea to uncared for due to D.J.'s specialized needs on June 6, 1997. The child was committed to DCF and said commitment has been continued without interruption and extended until June 6. 2000. Court ordered expectations were also entered at the time of the 1997 commitment.
Respondent mother filed a motion to modify the disposition from commitment to protective supervision. On July 20, 1998, the court denied the motion but ordered DCF to provide additional reunification services.
D.J. has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD). He has extreme difficulty focusing and concentrating. He is prone to injurious play and requires an inordinate amount of supervision and structure. A psychological evaluation performed by the Yale Child Study Center in the first half of 1999 indicates that D.J. has a borderline to deficient intellect and exhibits developmental delays. D.J. has significant difficulty controlling his behavior and easily becomes overwhelmed with his emotions and loses control. The drug Ritalin was prescribed in approximately November of 1998 and those involved in the care and education of D.J. have seen improvement in his behavior as a result of the medication. Yale concluded in part that: "(i)t is imperative that D.J. be provided with a permanent, safe, nurturing home environment. In the absence of this he will be unable to have a secure foundation upon which to build developmentally appropriate ways of expressing his emotions and relating with others." (State's Exh. D)
D.J. has spent over three years in the same professional foster home. At the time of trial the foster parents were committed to staying involved in D.J.'s life, but to what extent was not clear. The foster parents are not offering themselves as potential adoptive parents to D.J.
D.J. is the fourth of six children born to Donald B. Sr. and Deborah B. A probate court order of transfer of guardianship to the maternal grandmother was obtained for the eldest sibling CT Page 2825 Melissa B. (D.O.B. 3/9/87). Paternal rights were terminated as to Amber B. in April of 1999 with an appeal presently pending. The remaining children, Danielle (D.O.B. 10/12/90), Felicia (D.O.B. 3/25/92) and Vincent (D.O.B. 8/6/97) reside with their parents. All of the children to various degrees have special needs and are developmentally delayed.
Donald and Deborah B. met while attending substance abuse treatment at the Shirley Frank Program. They were married in 1987. There is a history of domestic violence between the parents. The family household is described as chaotic and dysfunctional.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Statute Sec. 17a-112 (c)(1). There exists clear and convincing evidence in this case that DCF and the parents of D.J. have had continuous contact. There is also clear and convincing evidence that DCF made reasonable efforts to reunify D.J. with his parents.
Reunification efforts centered around improving the parents' ability to effectively parent and safely care for D.J. in light of his special needs. A careful review of the evidence presented reflects the following services and providers were utilized in an effort to reunify.
Upon D.J.'s first return to his parents in 1996 Yale Intensive Home-Based Child and Adolescent Psychiatric Services (YIHCAPS) was activated to provide teaching, support and counseling. The services lasted from February through October of 1996. YIHCAPS worked evening hours to meet with the parents as a couple and also to accommodate Mr. B.'s work schedule.
Intensive Family Preservation Services (IFPS) was implemented to provide in-home support services three time a week. D.J. was removed for the second time while IFPS was in place. Subsequently Mrs. B. refused further services to improve her parenting skills CT Page 2826 with the remaining children in the home.
D.J. was evaluated regarding his development and to identify his special needs by the Yale Child Study.
Boys Village from January 30, 1997-March 27, 1997 offered the parents help with parenting skills and in-home support services. Mrs. B. refused the parenting skills and parenting education services, she felt she was capable of properly parenting her children. By April 8, 1997 Boys Village stated: "Mrs. (B.) has worked with numerous service providers and has clearly reached maximum therapeutic gain. She has limited intellect and is unable to learn problem solving skills necessary for caring for D.J. (and Amber). She is unable to control her anger in the presence of service providers even when she knows we are assessing her abilities as a parent." They noted that Mrs. B. was unable to focus on more than one child at a time.
Southern Connecticut State University's Family Counseling was tapped to offer couples counseling, family counseling and parenting skills. The evidence at trial reflected that not all the missed or canceled sessions were the parents' fault. Yet the parents were notified that it was up to them to initiate any further rescheduling of appointments which was never done by either parent. Neither parent ever communicated difficulty with transportation as a reason for their nonattendance. Southern closed their file in March of 1996.
New Haven Family Alliance was responsible for overseeing the different services being implemented and to make sure there was communication between the parties and to avoid duplication of services. They were available to give extra support to the family if necessary. (A waiting list existed in 1998 when the court ordered further reunification efforts.)
Connecting Children and Families (CCF) became involved with the family in June of 1997. Their role was to provide parent education, and hands on training during visitations between D.J. and his parents. Services were terminated in January 1998.
Milford Mental Health Center (MMHC) was recruited to work with the family in February of 1998. By April of 1998 MMHC had concluded that the case was not appropriate for their twelve week reunification program.[2]
CT Page 2827
Mr. B. was referred to the Substance Abuse Treatment Unit (SATU) for his substance abuse and began treatment in August of 1997. He completed the program but suffered relapses.
Throughout the reunification process DCF offered supervised visits, initially weekly, but eventually bimonthly. Treatment planning conferences were meant to include both Mr. and Mrs. B.[3] Both parents made it clear to all service providers that Mrs. B. was the primary child caretaker and that Mr. B. took a "back seat" when it came to parenting and caring for the children.
The above reflects the services and providers that were involved in the reunification effort as of the spring of 1998. DCF believed reunification efforts had been exhausted. A hearing on respondent mother's motion to revoke the commitment as to D.J. occurred in the summer of 1998. The court denied the motion but ordered DCF to provide further reunification services. DCF re-contacted the above service providers. DCF was unable to secure any service providers that were willing to work with the family toward reunification. Respondent mother's attorney and DCF eventually sought out the services of Carol Dillingham and Beryl Yudken.[4]
Carol Dillingham, a child development specialist and early childhood special education consultant was hired to provide on hands support to D.J. and his biological family regarding reunification efforts. She was hired to work with the family in their home while D.J. was visiting and with D.J. in his foster home and in his school. Berly Yudken, a licensed professional counselor was hired to work initially with Mrs. B. on her issues and needs and to then involve Mr. B in the treatment program. Yudken's goals in working with the parents were for them to: (1) Gain insight relative to the special needs and requirements of D.J., both physically and emotionally, with emphasis on safety considerations; (2) Gain insight relative to the need to develop a parenting style suitable to addressing those needs while continuing to meet the individual needs of her other children.; (3) Plan and implement that plan to integrate DJ. into the family system.; (4) Gain insight relative to the barriers, if any, which would hinder or prevent the aforementioned goals from being accomplished." (Respondent Father's Exhibit 8) Dillingham and Yudken were to work closely together in offering the family this intensive reunification effort. CT Page 2828
The above clinical intervention was a failure. Carol Dillingham testified at trial that she took the case with the goal and hope of reunification. From December 10, 1998 — January 28, 1999, Ms. Dillingham logged approximately thirty five hours on the case, which included five, three hour sessions on Saturdays with the parents and D.J. in Mr. and Mrs. B's home. (State's Exhibit E) Carol Dillingham ultimately recommended that reunification efforts be terminated in part due to the "(c)lear barrier given both [parents'] resistance at a philosophical, psychological and practical level despite knowledge of the importance of our time together in evaluation of the potential for reunification." (State's Exhibit E) Beryl Yudken concluded: "in evaluating any measurable outcomes from the above-defined goals, the results are negligible. It appears to this clinician that [Mrs. B.] has difficulty sorting out what is important for change to occur, and cannot separate out the relevant from the trivial in her life. She has difficulty making appropriate decisions and choices that could ultimately provide for more constructive and positive results." (Respondent's Father Exhibit 8)
The above analysis of the services provided the parents from 1996 to 1998 accurately reflects the efforts made to reunify D.J. with his biological parents. Admittedly D.C.F. at times had to be court directed to provide services. Nonetheless the quantity and quality of the services provided is clear and convincing evidence that reasonable efforts to reunified were made by D.C.F.
B. STATUTORY GROUND
The sole ground alleged as the basis for the termination of parental rights in this case is the failure of each parent to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. There is no dispute that D.J. had been previously committed as an un-cared for child with special needs in June of 1997. The contested issue is the degree of personal rehabilitation achieved by each of the parents and whether either parent could ever assume a responsible position in D.J.'s life.
Mrs.B.
Mrs. B. is limited in her intellectual functioning.[5]
Limited intelligence however was not the insurmountable obstacle CT Page 2829 that the various service providers encountered in their attempt to work toward reunification. Rather it was Mrs. B.'s unwillingness to work with the service providers that made it impossible for D.J. to be safely returned to her care. Mrs. B. would not recognize that D.J. had special needs and required extra supervision and additional home safety precautions to be maintained appropriately in her home. One service provider after another went into the home to identify the safety and parenting issues that needed to be addressed. Respondent mother would not maintain her composure long enough to begin working at altering the home environment or her behavior to meet D.J.'s needs. Mrs. B. would use valuable in home service time to express her anger and displeasure about the various service providers, D.C.F., and how she was being victimized. New, objective, independent service providers would be recruited to provide the requisite reunification services. Mrs. B. would inevitably either fail to accept the premise that outside intervention was necessary, fail to follow through with future appointments, or fail to incorporate any of the necessary recommendations into her interaction with D.J. It was always somebody else's fault that D.J. had been unjustly removed from her care. Respondent mother has never moved beyond her own victimization to do what has to be done to have D.J. returned to her care. There is little likelihood that the entrenchment exhibited by respondent mother will ever change.
Visits between D.J. and his parents were initially weekly. Dwight McGraw, a social work case aid with D.C.F. testified that he had supervised the visits between D.J. and his family since March of 1998. Visits supervised by Mr. McGraw had initially been two times a month or every other Saturday for three hours for approximately a year. Visits were then reduced to two hours every other Saturday. There had been a lapse in visits because Mrs. B. had activities, dance lessons and brownies with her two daughters, Danielle and Felicia. During visits Mrs. B. would spend at most forty to forty five minutes with D.J., sometimes as little as fifteen to twenty minutes. There were visits when Mrs. B. was not present, arrived late or left during the visits. Even with the institution of Ritalin and improvement in D.J.'s "demolition derby" type of behavior there was no significant change in respondent mother's behavior toward D.J. Significant is Beryl Yudken's observation: "[There is] a focus more on the other children in the household and their needs, considering DJ as almost an outsider, his visits intrusive, and thus setting up a barrier to integrating the child into the existing family system. CT Page 2830 Deborah states `that she has three children, sees herself as the parent of three children.'" (Respondent Father's Exhibit 8.)
Rehabilitation of a parent must be foreseeable within a reasonable time, given the needs of the particular child. In reMichael, 56 Conn. App. 688, 694 (2000). D.J, now six years old, has waited a total of almost four years in foster care for respondent mother to modify her behavior, parenting skills and home environment so that he could live safely and productively with her. Respondent mother will never be a constructive and useful parent to D.J. There is clear and convincing evidence that the respondent mother has failed to achieve the requisite degree of personal rehabilitation that is required for her to parent D.J.
Mr. B.
Respondent father did consistently visit with D.J. and engaged with D.J. during their visits. Mr. B. appeared to understand that changes needed to be made in the home and in how D.J. was cared for and parented. Mr. B. however saw that such changes were issues dealing with his wife and not with himself. He viewed himself as taking a back seat to parenting and that caring for the children was Mrs. B. responsibility, not his. Carol Dillingham observed that Mr. B. did not believe in exerting any control over D.J. "He (DJ) tells me what he wants to do. I can't or won't order him to do what I want him to do. . . When he wants to play(alone), I let him play, when he wants to eat, I let him eat". (State's Exhibit E)
At trial respondent father repeatedly tried to point out that the service providers did not include or focus on him. The reality is that Mr. B. never held himself out as a potential independent resource for D.J. Furthermore, several providers did attempt to specifically include him in their services (i.e. Southern, Carol Dillingham) but to no avail. Maura Callahan, the assigned D.C.F. worker on the case from February to October of 1998 testified that Mr. B. did not attend the one or possibly two administrative case review meetings held while she had the case.[6]
Mr. B. struggles with long term substance abuse. In 1997, after numerous referrals, respondent father submitted to a substance abuse evaluation which revealed alcohol dependency. He was referred to the Substance Abuse Treatment Unit (SATU). Mr. B. CT Page 2831 completed weekly individual therapy to focus on skill-building/relapse prevention on April 27, 1998. The last known relapse prior to the filing of the revised May 1999 summary of facts to substantiate the termination petition was in February of 1998. Respondent father re-engaged into treatment.
In addition to being alcohol dependent the 1997 evaluator also noted that Mr. B. exhibited a tired and depressed mood. The relapses with alcohol and the depressed mood that Mr. B. presented with in 1997 were also found to be present in a 1999 evaluation.[7] Respondent father has not sustained any significant progress in his ability to parent D.J. or in his ability to address his long term substance abuse problem and depressive emotional state. Respondent Father has failed to achieve the requisite degree of personal rehabilitation necessary. Accordingly the statutory ground alleged has been proven by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether D.C.F. has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. General Statute Sec. 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing.
The best interest of D.J. clearly and convincingly requires termination of the parental rights of his biological mother and father.
The court, in arriving at the decision to terminate parental rights must consider and make written findings regarding seven factors. CGS see. 17a-112 (e).
(1)This court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. As is evident in the preceding part of this opinion there were exhaustive efforts put forth to provide both parents with the services and providers that would enable them to reunite with D.J. When D.C.F. would falter the court and or counsel would step in and require or find further services. In the final analysis a plethora of services and providers were offered to the respondents. Mr. and Mrs. B. ultimately rejected, ignored or CT Page 2832 drove providers out of the case.
(2)This court also finds that D.C.F. made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980. For the reasons set forth previously the court finds that D.C.F. offered appropriate services and guidance, and sufficient time to permit the family to reunify.
(3)The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order must also be addressed. Court ordered specific steps or expectations were entered into at the time of the 1997 commitment.(State's Exhibit A) Respondent parents complied with the steps to the extent that they kept their whereabouts known to D.C.F., kept appointments with D.C.F., secured and maintained adequate housing and income, signed releases, visited the child, and had no involvement with the criminal justice system. As noted previously the parents participated in counseling but did not progress and follow through with counseling.
(4)The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties must be discussed.
There exists conflicting evidence of whether D.J. is bonded to his biological parents. He clearly has memories of living with his biological family. Stacey Paladino, guardian ad litem for D.J. has had contact with D.J. since April of 1998 in both his foster and biological homes. She testified that D.J. is familiar with his biological family but not necessarily emotionally bonded with them. D.J.'s interaction with his biological siblings is similar to how Stacey Paladino has seen D.J. behave with children on the playground.[8] Dr. Meier, a psychologist, who evaluated D.J. and his biological parents, when asked who are D.J.'s psychological parents concluded:
"That was difficult to determine. DJ refers to the foster parents as his family but he was not evaluated with them There is clearly limited affection, problems with trust, and lack of a strong bond with the [biological] parents at this time. While this may be due in part to the long separation, the parents' CT Page 2833 behavior does little to encourage closeness and reestablishment of a relationship. "
D.J.'s foster home is a stable, structured and nurturing home. He is bonded to his foster parents and his three older foster brothers. He is making strides in school and in his ability to better control and conform his behavior.[9] D.J. is and always will be a child with special needs who has suffered neglect and trauma in his early years. In a perfect world Mr. and Mrs. B. would have done what was necessary to have D.J. returned to them. In a not so perfect world the professional foster home in which D.J. has resided and flourished in for the past three years would have expressed an explicit interest in adopting D.J. The reality is neither has occurred.
(5)D.J. is now six and one half years old. He is entitled to leave the limbo he has been forced to live in for approximately half of his life.
(6)The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunited the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
It is unnecessary to restate Mrs. B.'s lack of engagement with D.J. during the years of supervised visits. There was no evidence presented as to whether Mrs. B. was permitted or encouraged to maintain contact with D.J.'s foster family. Mrs. B. does not perceive D.J. to be her child. Mrs. B. has stated that she has only three children.
Mr. B. did maintain substantial visitation with D.J. Respondent father, unlike Mrs. B., did make an effort with D.J. during their visits. This court believes Mr. B. genuinely cares about D.J. There is little dispute however that Mr. B. is incapable of assuming any responsible position in D.J.'s life. As Dr. Meier noted Mr. B. suffers from very low self esteem, significant anxiety and depression and is in need of serious emotional and substance abuse therapy. The question that this court has struggled with is whether any appreciable chance exists that Mr. CT Page 2834 B. would at some future date effectively deal with his problems and become a viable visiting or support resource for D.J. And if so, is it in the child's best interest to leave open that possibility. Dr. Meier testified that given respondent father's long history of substance abuse and mental health issues the prognosis is close to poor. This court finds that any benefit D.J. may have derived by leaving intact Mr. B's parental rights is outweighed by the possibility, however remote, of adoption.
(7)The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
There was limited evidence regarding the respondents' economic circumstances. This court is not aware of any financial obstacles that precluded potentially beneficial services from being implemented.[10] D.C.F. conducted supervised visits around the respondents' schedules. The foster home was in relatively close proximity to the biological home. Reunification failed because of the behavior and actions of the respondents, not because of anyone or anything else.
Nor can respondent father argue that Mrs. B.'s unreasonable conduct cost him his parental rights.[11] Admittedly, Mr. B. is emotionally dependent on Mrs. B. His dependency, which does not appear to be healthy, stems from his need to have a family. D.J. was a part of that family. Mr. B.'s need to keep D.J. a part of the family was not strong enough however to compel Mr. B. to seek treatment for his multiple mental health issues or to seek marriage counseling to deal with his turbulent marriage. Mr. B. is a grown man who has chosen to remain in his marriage. D.J. cannot safely survive if exposed to that union. It is Mr. B.'s choices and actions (or inactions) that require the termination of his parental rights as to D.J.
CONCLUSION
The court finds, based upon the testimony and evidence presented by clear and convincing evidence that it is in D.J.'s best interest to terminate the parental rights of Mr. and Mrs. B. as to D.J. These findings are made after considering D.J.'s needs, the length of time he has been in foster care, his need for permanency and the totality of the circumstances surrounding CT Page 2835 his tragic and difficult life.
Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of D.C.F. is appointed statutory parent for the child. A permanency plan for D.J. shall be submitted to the court within sixty days. A review plan shall be filed in accordance with state and federal law.
Bernadette Conway, Judge
[2] MMHC did indicate that long term intensive in-home services was, in its opinion, what was required for reunification to be possible. No such long term service existed. MMHC had a twelve week reunification program but after being involved with the family for a one month evaluation period, MMHC was unwilling to offer further services to the family.
[3] Coordinating Council for Children in Crisis (CCCC) had intermittently be involved with the family from 1991-1995. Credible evidence existed that Mrs. B. had voluntarily sought out services prior to DCF's initial 1995 involvement with the family.
[4] Counsel for Respondent mother should be commended for her diligence and hard work in finding a new reunification resource.
[5] Mrs. B. did obtain her GED in 1976. She reportedly was employed as a machine operator and assembler from 1984-1 989.(State's Exhibit B)
[6] Respondent Father's Attorney intimated and this court has no reason to disbelieve that Mr. B. had made other administrative case review meetings outside the February to October 1998 time frame.
[7] The 1999 evaluation took place in August. It is being used solely for the purpose of deciding whether rehabilitation is foreseeable "within a reasonable time" in the future. Because Mr. B. has continued to suffer relapses with alcohol and depression there is little likelihood that he will rehabilitate within a reasonable time. The reasonableness of any time line is construed in light of six year old D.J.'s needs, which are great and D.J.'s almost four year wait in foster care.
[8] It is noteworthy that in the July 1998 hearing Stacey Paladino believed reunification efforts were appropriate. She CT Page 2836 believed Mr. and Mrs. B. deserved one more chance. That last chance as far as the guardian ad litem was concerned was the involvement of Dillingham and Yudkin. At the present trial Stacey Paladino believed it was in D.J.'s best interest to terminate the respondent parents' parental rights.
[9] Counsel for D.J. has emphasized the timing and introduction of the drug Ritalin to deal with the child's ADHD. It should be noted that reunification efforts, particularly the involvement of Dillingham and Yudken occurred while D.J. was on Ritalin. Although the use of Ritalin has helped D.J.'s maladaptive behaviors it is not, in this court's opinion, a significant enough "cure" to alter this court's conclusions.
[10] To the contrary, the record reflects DCF spared no expense in attempting to reunite this family.
[11] Dr. Meier testified that at the time of his evaluation of the respondent parents and D.J. Mr. B. had vacated the marital home because Mrs. B. had acquired a new boyfriend who had begun residing with her in the home. Mr. and Mrs. B. apparently reconciled prior to the conclusion of the trial.
CT Page 2837
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 2838
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 2839
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 2840
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 2841
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 2842